UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

ZANE JACK FIELDS,

              Petitioner,

v.

RANDY BLADES, Warden,

              Respondent.

Case No. 1:95-cv-00422-EJL

**<u>CAPITAL CASE</u>**

**MEMORANDUM DECISION AND ORDER**

Pending before the Court is a Second Amended Petition for Writ of Habeas Corpus filed by Petitioner Zane Jack Fields, an Idaho state prisoner under a sentence of death.

This case has been stayed multiple times as Petitioner has attempted to exhaust his habeas claims in state court. The threshold issue of procedural default was initially addressed over a decade ago, and merits briefing was undertaken thereafter; however, due to later developments in habeas corpus law and the filing of a Second Amended Petition, the case is now back at the procedural default phase.

The Court previously entered a Scheduling Order setting forth the process by which litigation of the instant Petition for Writ of Habeas Corpus would proceed. (Dkt. 263.) Pursuant to that Scheduling Order, Petitioner filed a Motion for Evidentiary Hearing to Excuse Procedural Default (Dkt. 275), asserting that any procedural default of his habeas claims should be excused pursuant to (1) the actual innocence exception to

procedural default as set forth in *Schlup v. Delo*, 513 U.S. 298 (1995); or (2) the "cause and prejudice" exception to procedural default as set forth in *Coleman v. Thompson*, 501 U.S. 722 (1991), and expanded by *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), and *Trevino v. Thaler*, 133 S. Ct. 1911 (2013).

Having carefully reviewed the record, including the state court record, the Court finds that the facts and legal arguments are adequately presented in the briefs and record and therefore concludes that oral argument is unnecessary. D. Idaho Loc. Civ. R. 9.2(h)(5). Accordingly, the Court enters the following Order.

## BACKGROUND

### 1.     State Court Proceedings

At approximately 11:15 a.m. on February 11, 1988, Mary Catherine Vanderford[1] was stabbed to death during a robbery while she was working at the Wishing Well Gift Shop in Boise, Idaho. *State v. Fields*, 908 P.2d 1211, 1214 (Idaho 1995) (*Fields I*). In 1990, Petitioner was convicted of her murder. (State's Lodging A-2 at 104.)

#### A.     *Trial*

The evidence against Petitioner included testimony from inmate witnesses who stated that Petitioner had confessed to the murder, and made otherwise incriminating statements, while charged with and serving a sentence for a different crime. The inmate informants who testified at Petitioner's trial were Scott Bianchi, Joe "Turkey" Heistand,

---

[1]      In the state court record, Mrs. Vanderford is occasionally referred to as Katherine Marie Vanderford. *See State v. Fields*, 908 P.2d 1211, 1213 (Idaho 1995) (*Fields I*).

and Jeff Acheson.[2] In addition, a witness who knew Petitioner from a previous stint in prison—Keith Edson—testified that he saw Petitioner entering the Wishing Well gift shop shortly before the murder.

Several other witnesses identified Petitioner as acting suspiciously in the Linda Vista Plaza—an area about a half-mile from the gift shop—about an hour-and-a-half after the murder, and two of these witnesses testified that Petitioner had a wooden-handled knife sticking out of his pocket. This evidence corroborated the testimony of Joe Heistand, who stated that Petitioner admitted to using an old hickory butcher's knife to kill Mrs. Vanderford. *Fields I*, 908 P.2d at 1214-15. (*See also* State's Lodging A-41 at 1481-82.) There was no physical evidence introduced at Petitioner's trial, other than a few drops of blood on Petitioner's coat—which could not be confirmed as human and which the State has since acknowledged had no evidentiary value.

**B.**     ***First Motion for a New Trial***

Prior to sentencing, Petitioner moved for a new trial, presenting the testimony of Salvador Martinez, another inmate. Martinez, who allegedly had contact with some of the inmate informants prior to Petitioner's trial, testified at the evidentiary hearing on the motion for a new trial that several of the inmate snitch witnesses had recanted their testimony and admitted to Martinez that they lied about Petitioner's confession. (State's Lodging A-2 at 108-12; A-42 at 1716-44.)

---

[2]     A different inmate, Harold "Howie" Gilcrist, testified at Petitioner's preliminary hearing that Petitioner confessed to killing Mrs. Vanderford. Gilcrist did not testify at trial.

Martinez testified that before trial Bianchi had stated he was going to testify falsely against Petitioner. According to Martinez, Bianchi later admitted that his testimony against Petitioner was a lie and that "all his statements to the Court and stuff, and to the trial, that they were all made up between these inmates, okay; which is all the inmates involved in this case." (State's Lodging A-42 at 1720.) Specifically, Martinez testified that Bianchi admitted that he and the other inmates "didn't know shit about [Petitioner's case]. Who cares? He killed an old lady so that automatically there kills him." (*Id*. at 1727.) Martinez claimed Bianchi also said that he and the other testifying inmates had been "schooled" by the police on the details of the crime. (*Id*. at 1727-28, 1732.)

Martinez also testified that Harold Gilcrist (who testified at the preliminary hearing but not at trial) had told Martinez that Gilcrist and Bianchi needed to "stick to the same story they had already told," and that if they did not do so, "they're going to catch us for perjury and probably give us more time." (*Id*. at 1728.) Martinez claimed that Gilcrist and Heistand told him they were trying to "get a deal with . . . the cops" by testifying against Petitioner. (*Id*. at 1730-35.) According to Martinez, Heistand said that "everybody that heard about it wanted to get into the same boat." (*Id*. at 1733.) Heistand allegedly told Martinez he had never even spoken directly with Petitioner. (*Id*.)

In addition, Martinez testified that Gilcrist and Heistand informed him that "they had gotten a deal from the Prosecutor" or that "they were trying to get a deal with them still" for testifying against Petitioner. (*Id*. at 1739.) Martinez allegedly told them, "Well,

wait a minute. You already testified you don't have no deal with them." The inmates

responded, "We're waiting to see if we can go through, but we can't say publicly he has

to go through like parole procedures." (*Id.*) Martinez said he asked whether Gilcrist and

Heistand had lied about Petitioner, and Heistand allegedly responded, "So what, we got

what we wanted." (*Id.*)

Bianchi and Heistand also testified at the hearing on Petitioner's motion for a new

trial. Both inmates denied that they had made any statements to Salvador Martinez

regarding their testimony against Petitioner, and they denied that police or prosecutors

had fed them any information about the case. (*Id.* at 1819-20; 1830-31, 1838-40.) Gilcrist

testified as well, stating that he had never had any contact with Martinez and that he had

"never seen the gentleman in [his] life." (*Id.* at 1851.) Gilcrist also testified that police

and prosecutors had told Gilcrist he would not receive any privileges for testifying

against Petitioner at the preliminary hearing, but that they would try to ensure that

Gilcrist kept the privileges he had already earned. (*Id.* at 1857-58.) Acheson testified too,

confirming that he had not been promised any benefits for his trial testimony against

Petitioner. (*Id.* at 1862-71.)

After the state court heard from all of these witnesses, it found that the testimony

of Bianchi, Heistand, Gilcrist, and Acheson was credible, but that Martinez's testimony

was not. (State's Lodging A-2 at 145-47.) The court denied the motion for a new trial and

sentenced Petitioner to death. (*Id.* at 164-77.)

**C.** *Initial Postconviction Petition, Second Motion for a New Trial, and Unified Direct and Initial Postconviction Appellate Proceedings*

Petitioner filed a direct appeal, which was stayed in accordance with Idaho's special unified postconviction and appellate procedures applicable solely to capital cases. *See generally* Idaho Code § 19-2719. While his direct appeal was stayed, Petitioner filed an initial state postconviction action, alleging violations of the Fifth, Sixth, Eighth, and Fourteenth Amendments. (State's Lodging A-2 at 197-203, 218-19.) The state court denied relief. (*Id*. at 226-35.)

Petitioner filed another motion for a new trial in the postconviction proceeding, again asserting, with additional evidence, that inmate informant Scott Bianchi had recanted his trial testimony. (State's Lodging A-3 at 7-8.) The state district court held another evidentiary hearing. Inmate Kevin Amerson testified that Bianchi informed him Bianchi had been "schooled a little" on what to say at Petitioner's trial and that one of the prosecutors had promised Bianchi benefits for testifying. (State's Lodging A-44 at 49, 50-51.) Bianchi also supposedly told Amerson that Bianchi had committed perjury at Petitioner's trial. (*Id*. at 52.). Inmate Gary Marquess testified that Bianchi admitted to going over Petitioner's case file with Detective Dave Smith and that Bianchi said he felt bad for committing perjury against Petitioner. (*Id*. at 70-73.)

For his part, Bianchi admitted at the evidentiary hearing that he had told "pretty much whoever . . . would listen," including Petitioner's counsel and Petitioner himself, that Bianchi had committed perjury at Petitioner's trial. (*Id*. at 10.) Bianchi went on to testify, however, that his recantations were false, that he had told the truth when he

testified against Petitioner, and that he had never been shown the police file. (*Id*. at 10-14.) Bianchi explained that he had falsely recanted his trial testimony because he had been threatened by other inmates, and Petitioner led him to believe that these threats would stop if Bianchi recanted. (*Id*. at 26-27.)

The state court found that Bianchi's testimony at trial and during postconviction proceedings was "true in those respects that are material." (State's Lodging A-3 at 60.) Though there were a few discrepancies between what postconviction counsel and Bianchi remembered about their conversation, the court found that these were mere differences in perception and memory. (*Id*.) The state court noted that Bianchi had never recanted his trial testimony under oath, but that all of his statements that he lied at Petitioner's trial or that he was fed information by the police were made outside of court: "When testifying under oath [Bianchi] has consistently maintained [that] his version of events at trial were true." (*Id*. at 59-60.) The court found that Bianchi's explanation for his false recantations—that he believed he would be safer if he recanted—"is believable and believed by this court." (*Id*. at 60.)

Petitioner appealed. In the consolidated direct appeal and initial postconviction appellate proceedings, the Idaho Supreme Court upheld Petitioner's conviction and sentence and rejected the claims in his initial postconviction petition. *Fields I*, 908 P.2d at 1225.

**D.    *Second Postconviction Petition***

Petitioner later filed a second postconviction petition in the state district court. (State's Lodging C-57 at 4-54.) Petitioner claimed, among other things, that his direct appeal and initial postconviction counsel operated under a conflict of interest. (*Id*. at 10-12.) The trial court dismissed the petition, and the Idaho Supreme Court affirmed. *Fields v. State*, 17 P.3d 230, 232 (Idaho 2000) (*Fields II*).

**E.    *Third Postconviction Petition***

In June 2002, Petitioner filed a third state postconviction petition, requesting DNA testing of several pieces of evidence. (State's Lodging G-87 at 7-14.) Petitioner was eventually excluded as a contributor of (1) DNA found under Mrs. Vanderford's fingernails, and (2) hairs recovered from her clothing. This third postconviction petition also included an affidavit from inmate informant Jeff Acheson, alleging that he was fed information by the authorities to support his trial testimony that Petitioner made incriminating statements to Acheson.

The state district court determined that there was nothing but speculation that the DNA under the victim's fingernails actually came from the murderer; therefore, Petitioner had not met the standards for successive postconviction relief under state law. (State's Lodging G-88 at 259-60.) The Idaho Supreme Court affirmed, holding that DNA results might justify a successive application for postconviction relief if there were "admissible evidence showing that the material tested came from the person who committed the crime," but there was no such evidence in Petitioner's case. *Fields v. State*,

253 P.3d 692, 698 (Idaho 2011) (*Fields IV*). The court also held that Acheson's affidavit was merely impeaching and therefore could not support a successive petition for postconviction relief under Idaho law. (*Id.* at 699.)

### F.    *Fourth Postconviction Petition*

Petitioner filed a fourth postconviction petition based on the United States Supreme Court's decision in *Ring v. Arizona*, 536 U.S. 584 (2002). The state courts denied relief because *Ring*, which held that juries rather than judges must determine the presence or absence of aggravating factors necessary to impose the death penalty, did not, under Idaho law, apply retroactively to cases that became final before *Ring* was decided. *Fields v. State*, 234 P.3d 723, 725 (Idaho 2010) (*Fields III*); *see also Schriro v. Summerlin*, 542 U.S. 348, 358 (2004) (holding that *Ring* does not apply retroactively under federal law).

### G.    *Fifth Postconviction Petition*

In October 2010, Petitioner filed a fifth state postconviction petition based on a police detective's destruction of Petitioner's orange camouflage coat—the coat Petitioner was wearing when his former cellmate, Keith Edson, saw him entering the Wishing Well shortly before the murder. (State's Lodging I-114 at 10-18.) The state district court denied relief, holding that the coat was not material evidence, because photos of the coat remained in evidence, and that Petitioner suffered no prejudice from the coat's destruction. (*Id.* at 193-94.) The Idaho Supreme Court affirmed on a different ground: that the postconviction petition regarding the destruction of the coat was not timely filed.

*Fields v. State*, 298 P.3d 241, 244-45 (Idaho 2013) (*Fields V*). Neither court addressed

the question whether the coat was destroyed inadvertently or in bad faith.

### H.    *Sixth Postconviction Petition*

Petitioner's sixth and final state postconviction petition was filed in July 2011.

Petitioner presented an affidavit of Howard Gilcrist, who testified against Petitioner at the

preliminary hearing (but not at trial). Gilcrist's affidavit stated that his preliminary

hearing testimony was false, that Petitioner did not confess to Gilcrist as Gilcrist had

previously testified, and that the police fed Gilcrist information about the crime to allow

him to report Petitioner's confession. (State's Lodging K-121.) This sixth petition was

dismissed as procedurally barred, and the Idaho Supreme Court affirmed. *Fields v. State*,

314 P.3d 587, 590-93 (Idaho 2013) (*Fields VI*).

### 2.    Federal Proceedings

As noted previously, Petitioner's federal habeas case has been stayed and

reopened more than once over the last two decades so Petitioner could exhaust his claims

in state court. The Court previously determined that many of Petitioner's claims, as

presented in his First Amended petition, were procedurally defaulted—including all of

Petitioner's claims of ineffective assistance of counsel other than Claim 8 (which is based

on trial counsel's alleged refusal to allow Petitioner to testify at trial). (Dkt. 109, 127.)

Petitioner has reasserted his procedurally defaulted claims, and added some entirely new

claims, in the Second Amended Petition. Petitioner now moves for an evidentiary hearing

to excuse the procedural default of those claims.

## AMENDMENT OF SCHEDULING PLAN

Substantial changes in habeas corpus law and procedure have occurred since this Court last amended Local Civil Rule 9.2, which governs capital habeas corpus proceedings in the District of Idaho. Therefore, the Court will exercise its discretion to depart from the schedule set by that rule and by the Court's previous Scheduling Order, based on changes in the law and concerns of judicial efficiency and economy. *See* Loc. R. 9.2(a) ("The application of this rule may be modified by the judge to whom the petition is assigned.").

Currently, Local Rule 9.2 separates the adjudication of capital habeas corpus claims into a preliminary stage, where dismissal of claims based on procedural grounds may occur, and a final stage, where the merits of any remaining claims are decided. Each of these stages may include discovery and/or an evidentiary hearing.

Given changes in the law, however, the Court has determined that, rather than divide the remainder of this case into a procedural defenses stage and a merits stage (each with its own potential for discovery and evidentiary hearings), it is more appropriate to separate the case into a paper review stage and, if necessary, an evidentiary hearing stage. That is, the Court will separate these proceedings into stages based on whether an evidentiary hearing is necessary, resolving *all* claims (and procedural issues) that can be resolved without an evidentiary hearing before holding *any* evidentiary hearings. This seems like the most efficient way to address Petitioner's claims, given that the law has

trended toward fewer opportunities for evidentiary hearings on the merits[3] and more

opportunities for evidentiary hearings on procedural grounds.[4] Further, the United States

Supreme Court has suggested that the merits of non-defaulted claims should be heard

ahead of other claims where difficult procedural hurdles must be cleared before the

merits of those other claims can be addressed. *See Dretke v. Haley*, 541 U.S. 386, 393-94

(2004) ("[A] federal court faced with allegations of actual innocence, whether of the

sentence or of the crime charged, must *first* address all non-defaulted claims for

comparable relief and other grounds for cause to excuse the procedural default.")

(emphasis added).

      If it appears that an evidentiary hearing might be required as to procedural issues

or the merits, the Court will defer the decision on whether to hold such a hearing until

after its paper review. For these reasons, the Court will first address any procedural issues

with respect to the Second Amended Petition that it determines do not require an

evidentiary hearing, followed by consideration of the merits of any claims for which an

evidentiary hearing is not permitted or required. Then, if habeas relief is not warranted as

---

[3]    *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011) (holding that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits"); *Detrich v. Ryan,* 740 F.3d 1237, 1246-47 (9th Cir. 2013) (en banc) (plurality) (clarifying that evidentiary development and hearings are only available for claims *not* adjudicated on the merits in state court, at least so far as the state court's factual determinations upon which the adjudication was based are not unreasonable).

[4]    *See Martinez v. Ryan*, 132 S. Ct. 1309 (2012) (holding that inadequate assistance of post-conviction review counsel or lack of counsel "at initial-review collateral review proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial"); *Detrich*, 740 F.3d at 1246 (plurality) ("[T]he district court should allow discovery and hold an evidentiary hearing where appropriate to determine whether there was 'cause' under *Martinez* for the state-court procedural default and to determine, if the default is excused, whether there has been trial-counsel IAC.").

to any of those claims, the Court will decide whether to hold evidentiary hearings on any remaining issues (procedural or merits-based) in this case. If further briefing is required on any issue, the Court will so notify the parties.[5]

## PROCEDURAL DEFAULT STANDARD OF LAW

A habeas petitioner must exhaust his or her remedies in the state courts before a federal court can grant relief on constitutional claims. *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). To do so, the petitioner must invoke one complete round of the state's established appellate review process, fairly presenting all constitutional claims to the state courts so that they have a full and fair opportunity to correct alleged constitutional errors at each level of appellate review. *Id.* at 845.

The mere similarity between a federal claim and a state law claim, without more, does not satisfy the requirement of fair presentation. *See Duncan v. Henry*, 513 U.S. 364, 365-66 (1995) (per curiam). General references in state court to "broad constitutional principles, such as due process, equal protection, [or] the right to a fair trial," are likewise

---

[5]     The Court has considered the fact that, in every capital case, numerous motions for extensions of time and for enlargement of page limitations are often filed with respect to the parties' briefs. The Court's generous time and page allowances as set forth in this Memorandum Decision and Order are intended to lessen the need for such motions. The Court particularly does not expect that the parties will need a substantial amount of time to prepare their remaining briefs in this case, as they have already submitted briefing on the merits of many of Petitioner's habeas claims. (*See* Dkt. 208, 224, 236.)

    However, the Court will not prohibit entirely the filing of motions for extensions of time or for enlargement of page limitations. The Court acknowledges that the size of the Court's docket makes it impossible to determine every matter as quickly as some parties might wish. However, because of the nature of the death penalty, it is imperative that the parties and the Court have adequate time to litigate and to resolve the case, respectively. The Court is confident that counsel will use their resources reasonably and with their best judgment throughout the remainder of this litigation and will manage requests for time and page extensions accordingly.

insufficient. *See Hiivala v. Wood*, 195 F.3d 1098, 1106 (9th Cir. 1999). The law is clear that, for proper exhaustion, a petitioner must bring his federal claim before the state court by "explicitly" citing the federal legal basis for his claim. *Lyons v. Crawford*, 232 F.3d 666, 669 (9th Cir. 2000), *as amended*, 247 F.3d 904 (9th Cir. 2001).

When a habeas petitioner has not fairly presented a constitutional claim to the highest state court, and it is clear that the state court would now refuse to consider it because of the state's procedural rules, the claim is said to be procedurally defaulted. *Gray v. Netherland*, 518 U.S. 152, 161-62 (1996). Procedurally defaulted claims include those within the following circumstances: (1) when a petitioner has completely failed to raise a claim before the Idaho courts; (2) when a petitioner has raised a claim, but has failed to fully and fairly present it as a *federal* claim to the Idaho courts; and (3) when the Idaho courts have rejected a claim on an adequate and independent state procedural ground. *Id.*; *Baldwin v. Reese*, 541 U.S. 27, 32 (2004); *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

If a petitioner's claim is procedurally defaulted, a federal district court cannot hear the merits of the claim unless the petitioner meets one of two exceptions: (1) a showing of actual innocence, which means that a miscarriage of justice will occur if the constitutional claim is not heard in federal court, *Schlup v. Delo*, 513 U.S. 298, 329 (1995); or (2) a showing of adequate legal cause for the default and prejudice arising from the default, *Murray v. Carrier*, 477 U.S. 478, 488 (1986).

Neither a claim of cause and prejudice nor a *Schlup* actual innocence claim is an independent constitutional claim. Rather, these are federal *procedural* claims that, if sufficiently established by the petitioner, allow a federal court to consider the merits of an otherwise procedurally-defaulted constitutional claim.

## DISCUSSION

**1.      The Court Will Deny Without Prejudice Petitioner's Request for an Evidentiary Hearing on Actual Innocence under *Schlup v. Delo***

The parties have fully briefed the Motion for Evidentiary Hearing, including Petitioner's argument that he is entitled to develop evidence supporting his *Schlup* gateway claim of actual innocence.[6] The Court finds that although substantial amounts of time and resources have already been spent briefing Petitioner's *Schlup* claim, it would be most efficient, economical, and consistent with the principles of federalism and comity to table that issue at this time.

The taxpayers would incur great expense if the Court were to determine that, based on Petitioner's *Schlup* claim, evidentiary hearings should be held in this case, potentially on *all* of Petitioner's defaulted claims, before the Court determines whether a non-defaulted claim might entitle Petitioner to habeas relief—in which case adjudication of Petitioner's *Schlup* claim would be unnecessary. Further, declining to address a difficult actual innocence issue—unless it cannot be avoided—is the preferred method of resolving the procedural default issue. *See Dretke*, 541 U.S. at 393-94. This is particularly so where, as here, the petitioner's actual innocence procedural claim is not obviously

---

[6]      The Court denied without prejudice Petitioner's previous motion for an evidentiary hearing on his *Schlup* claim. *See* Dkt. 196.

meritless. Additionally, a *Schlup* claim allows consideration of new evidence that the state courts never addressed, and a federal court should refrain from considering such evidence unless that consideration is both permitted and required.

"Success on the merits would give [Petitioner] all of the relief that he seeks," and a *Schlup* determination and potential hearing would not be required if one of Petitioner's non-defaulted claims entitles him to relief. *Id.* at 394 (internal quotation marks omitted). Therefore, the Court will defer consideration of whether to hold a hearing on Petitioner's *Schlup* claim until after the Court has considered (1) the cause and prejudice exception to procedural default, and (2) the merits of Petitioner's non-defaulted claims (or the merits of any claim for which cause and prejudice exist to excuse procedural default). Petitioner's latest request for an evidentiary hearing on his *Schlup* claim will be denied without prejudice.

The Court will address in this Memorandum Decision and Order Petitioner's request for an evidentiary hearing on whether cause and prejudice exist, under *Martinez v. Ryan*, to excuse the procedural default of Petitioner's ineffective assistance of counsel claims. The Court will then address, in a later decision, the merits of any claims that are not defaulted (or are excused from procedural default). Finally, if Petitioner is not entitled to relief on the merits of any of those claims, the Court will allow Petitioner to renew his request for an evidentiary hearing to develop his *Schlup* gateway claim, and the Court will consider whether to allow further briefing on that issue at that time.[7]

---

[7]     Although a *Schlup* claim is not an independent constitutional claim, habeas petitioners under a sentence of death may be able to assert a freestanding actual innocence claim. The

The Court will now address Petitioner's request for an evidentiary hearing

regarding cause and prejudice under *Martinez v. Ryan*.

**2.      Petitioner Is Not Entitled to an Evidentiary Hearing To Establish Cause and Prejudice, under *Martinez v. Ryan*, To Excuse the Procedural Default of His Ineffective Assistance of Counsel Claims.**

Petitioner argues that some of his procedurally defaulted ineffective assistance of

counsel claims may properly be heard on the merits pursuant to *Martinez v. Ryan*. As

noted above, a procedurally defaulted claim may be considered on the merits if a

petitioner establishes cause and prejudice to excuse the default. *Coleman*, 501 U.S. at

750. "An evidentiary hearing is not necessary to allow a petitioner to show cause and

prejudice if the court determines as a matter of law that he cannot satisfy the standard."

*Clark v. Lewis*, 1 F.3d 814, 820 (9th Cir. 1993).

Because Petitioner cannot, as a matter of law, satisfy the *Martinez* standard for

cause and prejudice, the Court will deny his request for an evidentiary hearing on that

issue.

---

Supreme Court has not yet resolved this question. *See McQuiggin v. Perkins*, 133 S. Ct. 1924, 1931 (2013) ("We have not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence."); *Herrera v. Collins*, 506 U.S. 390, 417 (1993) ("We may assume, for the sake of argument in deciding this case, that in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim.").

Petitioner asserts a freestanding actual innocence claim in his Second Amended Petition. As with Petitioner's *Schlup* gateway claim, the Court will refrain from addressing his freestanding actual innocence claim until after consideration of the merits of Petitioner's other claims.

**A.    *Cause and Prejudice Standard of Law***

The parties agree, and the Court has determined based on its own review of habeas corpus law, that the state court's factual findings as to the reliability and credibility of the evidence presented in state postconviction proceedings are entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1), even if they relate to a procedural default issue. (Dkt. 298 at 56; Dkt. 313 at 15); *see also Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010) ("While Section 2254(d) thus has no application in the context of [an exception to procedural default] because it pertains only to a 'claim that was adjudicated' in state court, Section 2254(e)(1) does come into play because it refers to the 'determination of a factual issue'—that is, to a state court's findings of fact, rather than its conclusions of federal law."). Therefore, any factual findings of the state court—even those relating to a procedural default issue such as cause and prejudice—are conclusive, unless Petitioner rebuts them by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

To show "cause" for a procedural default, a petitioner must ordinarily demonstrate that some objective factor external to the defense impeded his or his counsel's efforts to comply with the state procedural rule at issue. *Murray*, 477 U.S. at 488. To show "prejudice," a petitioner generally bears "the burden of showing not merely that the errors [in his proceeding] constituted a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire [proceeding] with errors of constitutional dimension." *United States v. Frady*, 456 U.S. 152, 170 (1982).

A petitioner does not have a federal constitutional right to effective assistance of counsel during state postconviction proceedings. *Pennsylvania v. Finley*, 481 U.S. 551, 554 (1987); *Bonin v. Vasquez*, 999 F.2d 425, 430 (9th Cir. 1993). As a result, the general rule is that any errors of counsel during a postconviction action cannot serve as a basis for cause to excuse a procedural default. *Coleman*, 501 U.S. at 752.

*Martinez v. Ryan* established a limited exception to this general rule, an exception that applies only to Sixth Amendment ineffective assistance of counsel ("IAC") claims. *Martinez* held that inadequate assistance of postconviction review ("PCR") counsel or lack of counsel at initial-review collateral proceedings "may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." 132 S. Ct. at 1315. The Court will refer to claims of ineffective assistance of trial counsel as "IATC" claims.

In *Nguyen v. Curry*, 736 F.3d 1287, 1293 (9th Cir. 2013), the Ninth Circuit extended *Martinez*, holding that it can also apply to underlying claims of ineffective assistance of direct appeal counsel ("IADAC"). Postconviction counsel's ineffectiveness cannot constitute cause with respect to any claim other than an IATC or IADAC claim. *See Hunton v. Sinclair*, 732 F.3d 1124, 1126-27 (9th Cir. 2013) (declining to extend *Martinez* to underlying claims based on *Brady v. Maryland*, 373 U.S. 83 (1963)), *cert. denied*, 134 S. Ct. 1771 (2014).

In *Trevino v. Thaler*, the Supreme Court described the *Martinez* analysis as consisting of four prongs:

> We . . . read *Coleman* as containing an exception, allowing a
> federal habeas court to find "cause," thereby excusing a
> defendant's procedural default, where (1) the claim of
> "ineffective assistance of trial counsel" was a "substantial"
> claim; (2) the "cause" consisted of there being "no counsel"
> or only "ineffective" counsel during the state collateral
> review proceeding; (3) the state collateral review proceeding
> was the "initial" review proceeding in respect to the
> "ineffective-assistance-of-trial-counsel claim"; and (4) state
> law requires that an "ineffective assistance of trial counsel
> [claim] . . . be raised in an initial-review collateral
> proceeding."

133 S. Ct. 1911, 1918 (2013) (quoting *Martinez*, 132 S. Ct. at 1318-21) (alterations in

original).

The third and fourth prongs of the analysis are rarely in dispute. With respect to

the third prong, the *Martinez* exception applies only to the lack of counsel or

ineffectiveness of counsel in the *initial* postconviction review proceeding. It "does not

extend to attorney errors in any proceeding beyond the first occasion the State allows a

prisoner to raise a claim of ineffective assistance." *Martinez*, 132 S. Ct. at 1320. Rather,

the Court in *Martinez* was singularly concerned that, if ineffective assistance of trial

counsel claims were not brought in the collateral proceeding which provided the first

occasion to raise such claims, the effect was that the claims could not be brought *at all.*

*Id.* at 1316. Therefore, a petitioner may not assert as cause attorney error that occurred in

"appeals from initial-review collateral proceedings, second or successive collateral

proceedings, [or] petitions for discretionary review in a State's appellate courts." *Id.* at

1320.

With respect to the fourth *Martinez* prong—that state law must require IAC claims to be brought in an initial-review collateral proceeding—the Supreme Court in *Trevino* extended *Martinez* to apply not only where a State *requires* IAC claims to be raised in postconviction proceedings, but also where a State's "procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal." 133 S. Ct. at 1921. *Martinez* clearly applies to capital cases in Idaho, where a defendant must raise any IAC claims in a postconviction action litigated *before* the direct appeal. *See* Idaho Code § 19-2719.

The two strongly disputed issues in a *Martinez* inquiry are generally the first prong, whether an underlying IAC claim is substantial (the "prejudice" prong of the cause and prejudice analysis); and the second prong, whether PCR counsel rendered ineffective assistance by failing to raise that IAC claim in state postconviction proceedings (the "cause" prong of the cause and prejudice analysis). *See Clabourne v. Ryan*, 745 F.3d 362, 377 (9th Cir. 2014).

    i.    <u>Prong One: Substantiality of Underlying IAC Claims</u>

For the *Martinez* exception to apply, a petitioner must bring forward evidence demonstrating that his underlying IAC claim is substantial. The United States Supreme Court has defined "substantial" as a claim that "has some merit." *Martinez*, 132 S. Ct. at 1318-19 (comparing the standard for certificates of appealability from *Miller-El v.*

*Cockrell*, 537 U.S. 322 (2003)). Stated inversely, a claim is "*in*substantial" if it "does not have any merit or . . . is wholly without factual support." *Id.* at 1319.

Determining whether an IAC claim is substantial requires a federal court to examine the claim under *Strickland v. Washington*, 466 U.S. 668 (1984). A petitioner asserting ineffective assistance of counsel must show that (1) "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and (2) counsel's errors "deprive[d] the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

Under the first *Strickland* prong, whether an attorney's performance was deficient is judged against an objective standard of reasonableness. *Id.* at 687-88. A reviewing court's inquiry into the reasonableness of counsel's actions must not rely on hindsight:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Id.* at 689 (internal citations and quotation marks omitted).

Strategic decisions, such as the choice of a defense or which witnesses or other evidence to present, "are virtually unchallengeable" if "made after thorough investigation of law and facts relevant to plausible options." *Id.* at 690. Moreover, an attorney who decides not to investigate a particular theory or issue in the case is not ineffective so long as the decision to forego investigation is itself objectively reasonable:

> [S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Id.* at 690-91.

If a petitioner shows that counsel's performance was deficient, the next step in the *Strickland* inquiry is the prejudice analysis. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691. To satisfy the prejudice standard, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. A "reasonable probability" is defined as a "probability sufficient to undermine confidence in the outcome." *Id*. As the *Strickland* Court instructed:

In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

*Id.* at 695-96.

These standards from *Strickland* for determining deficient performance and prejudice, are, of course, the standards for an eventual review of the merits of the underlying IAC claim. The question whether an IAC claim is substantial under *Martinez* is not the same as a merits review; rather, it is more akin to a preliminary review of a *Strickland* claim for purposes of determining whether a certificate of appealability should issue. *See Martinez*, 132 S. Ct. at 1318-19. Therefore, a court may conclude that a claim is substantial when a petitioner has shown that resolution of the merits of the *Strickland* claim would be "debatable amongst jurists of reason" or that the issues presented are "adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 336 (internal quotation marks omitted). Thus, to determine whether a claim is substantial, *Martinez* requires the district court to *review* but not *determine* whether trial or appellate counsel's acts or omissions resulted in deficient performance and in a reasonable

probability of prejudice, and to *determine* only whether resolution of the merits of the IAC claim would be debatable among jurists of reason and whether the issues are deserving enough to encourage further pursuit of them.

<blockquote>
ii.   <u>Prong Two: Lack of PCR Counsel or Ineffective Assistance of PCR Counsel</u>
</blockquote>

In addition to showing that the underlying IAC claim is substantial, a petitioner seeking to invoke the *Martinez* exception must also show either that he had no counsel on initial postconviction review, or that his PCR counsel was "ineffective under the standards of *Strickland*." 132 S. Ct. at 1318. Again, "ineffectiveness" is a term defined by *Strickland* as (1) deficient performance and (2) a reasonable probability of prejudice caused by the deficient performance. 466 U.S. at 694, 700.

As to PCR counsel's performance, not just any error or omission of initial PCR counsel will be deemed deficient performance that will satisfy *Martinez*. If the "attorney in the initial-review collateral proceeding did not perform below constitutional standards," the PCR attorney's performance does not constitute cause to excuse the procedural default of an underlying IAC claim. 132 S. Ct. at 1319. The *Strickland* standards for analyzing deficient performance set forth above apply with equal force to PCR counsel in the context of a *Martinez* argument. Importantly, PCR counsel "is not necessarily ineffective for failing to raise even a nonfrivolous claim." *Sexton v. Cozner*, 679 F.3d 1150, 1157 (9th Cir. 2012). If PCR counsel's performance is deficient, then the court must consider whether that performance was prejudicial under *Strickland*. *Clabourne*, 745 F.3d at 377.

Therefore, even if Petitioner shows, under the first *Martinez* prong, that his underlying IAC claims are substantial, he must still show, under the second *Martinez* prong, that postconviction counsel rendered deficient performance and that, "but for post-conviction counsel's failure to raise [the substantial IAC] claims, there is a reasonable probability that the result of the post-conviction proceeding would have been different." *Id.* at 378. These two inquiries will, at times, collapse into one. *Id.* at 382 ("Under the circumstances of this case, if [the petitioner] succeeds in demonstrating that he was prejudiced by the failure of his post-conviction counsel, he will necessarily have established that there is at least 'some merit' to his claim that he suffered ineffective assistance of trial counsel at resentencing."). The Court may address either inquiry first, and the resolution of one prong may obviate the need to address the other. *See Martinez*, 132 S. Ct. at 1319 ("When faced with the question whether there is cause for an apparent default, a State may answer that the ineffective-assistance-of-trial-counsel claim is insubstantial, *i.e.*, it does not have any merit or that it is wholly without factual support, or that the attorney in the initial-review collateral proceeding did not perform below constitutional standards.").

**B.** ***Application of* Martinez v. Ryan *to Petitioner's Procedurally Defaulted IATC Claims***

Claim 3 of the Second Amended Petition presents seventeen IATC sub-claims. Although Petitioner claims generally that *Martinez* "excuses any default" of "all of Claim 3" (Dkt. 275-1 at 44), the only IATC sub-claims that Petitioner specifically supports with argument regarding *Martinez* are Claims 3(A), 3(C), 3(D), 3(E), 3(F), 3(I), 3(J), 3(K),

3(L), 3(N), and 3(O).[8] Therefore, the Court will address only those eleven IATC claims—which will be separated into five discussion sections below. The Court finds that Petitioner's *Martinez* arguments regarding all other IAC claims have been either forfeited or voluntarily waived. *See Jones v. Knipp*, 2013 WL 6145245, *2 (E.D. Cal. Nov. 21, 2013) (unpublished) ("Bare contentions, unsupported by explanation or authority, are deemed waived."); *FDIC v. Garner*, 126 F.3d 1138, 1145 (9th Cir. 1997) ("Appellants present no case law or argument in support of this claim. Accordingly, we deem the argument waived."); *United States v. Perez*, 116 F.3d 840, 845 (9th Cir. 1997) (9th Cir. 1997) (distinguishing between the concepts of forfeiture and waiver).

After a thorough review of the entire record, the Court concludes that Petitioner is unable, as a matter of law, to show that these eleven procedurally defaulted IATC claims are substantial and that his PCR counsel rendered ineffective assistance under the standards of *Strickland* in failing to raise them.

i.  <u>Claims That Trial Counsel Failed To Investigate and Adequately Cross-examine Edson and the Inmate Informants</u>

The first set of IATC claims that Petitioner alleges are excused from default under *Martinez* involves trial counsel's investigation and cross-examination of Edson and the inmate snitch witnesses. (Dkt. 275-1 at 44-45, 50-53.) This group of claims consists of Claims 3(A) (Edson and Bianchi), 3(E) (Heistand), and 3(F) (Acheson).

---

[8] Unfortunately, Petitioner's briefing did not identify by number the particular IATC claims addressed in that briefing, and Respondent and the Court were thus required to compare Petitioner's briefs with his 44-claim Second Amended Petition to determine which claims were actually at issue with respect to Petitioner's *Martinez* argument. For this reason, the Court will require that all further briefs in this case specifically indicate, by number, which particular claims or sub-claims are discussed in each particular section of the brief.

a)    *Claim 3(A)(i): Keith Edson*

Nearly two weeks after the murder of Mrs. Vanderford, Petitioner was arrested on an unrelated charge stemming from an assault Petitioner committed while shoplifting at Shopko. Keith Edson, a former inmate who was celled next door to Petitioner for about six months in the early 1980s, saw a television report of Petitioner's arrest in the Shopko matter and called police, informing them that he had seen Petitioner entering the Wishing Well gift shop on the day of or the day after the murder of Mrs. Vanderford. Edson had not come forward initially because although he recognized Petitioner when he first saw him at the gift shop, Edson was unsure whether it was important and could not remember Petitioner's name. Edson was only able to remember the name "Zane Fields" once he saw the coverage of the Shopko incident. *Fields I*, 908 P.2d at 1215; State's Lodging A-40 at 1212-13.)

At trial, Edson testified that on February 11, 1988—the day of the murder—he was walking near the Wishing Well gift shop after going to an arcade. At about 11:00 a.m., Edson was smoking a cigarette when he saw Petitioner enter the gift shop. (State's Lodging A-40 at 1196-1208.) Recognizing Petitioner but unable to remember his name, Edson waited for him to come out of the shop. Edson then saw Petitioner leaving the area, though he did not actually see him exit the gift shop. (*Id*. at 1209.) Edson decided not to approach Petitioner because he had a "gut feeling"; Petitioner appeared nervous and was looking around "like something wasn't right." (*Id*. at 1210.) Edson testified that although he initially said that he had seen Petitioner "on the day or day after" the murder,

"going over what [he] saw with the detectives" convinced him that it was definitely the day of the murder. (*Id*. at 1249.)

Petitioner acknowledges that trial counsel "substantially" and "terrifically" impeached Edson. (Dkt. 275-1 at 50; Dkt. 313 at 47.) For example, Edson testified at trial that he went to several places while he was out walking on the day of the murder, including Taco Bell, where he bought a soda. (State's Lodging A-40 at 1243-44.) Defense counsel later called Robert Jue as a witness. Jue, an employee of the Central District Health Department, testified that the Taco Bell where Petitioner said he stopped had not even been open for business on February 11th, 1988, because it was still under construction and had not yet received its operating license. (State's Lodging A-42 at 1630, 1633-35.)

Edson also testified that there were no cars in the BMC parking lot near the gift shop at the time he saw Petitioner and that the BMC business was closed. (State's Lodging A-40 at 1264-65.) However, the victim's husband, who had been outside the store before the murder, testified that the BMC store was open and there were several cars in the parking lot. (State's Lodging A-39 at 917-19.) Edson also claimed that he saw only one vehicle in the parking lot of the gift shop—a van that Edson testified had windows only on the driver's and front passenger's doors and perhaps in the back. (State's Lodging A-40 at 1465-66.) But another witness testified that there were three or four cars in the Wishing Well parking lot and that her van—presumably the one Edson saw—was "loaded with windows." (State's Lodging A-39 at 979-82.)

Edson further stated that he did not see anyone other than Petitioner enter the gift shop, even though two women entered and left the near the time Edson saw Petitioner enter the shop. (State's Lodging A-40 at 1266-68.) In addition, Edson testified that Petitioner was wearing an orange camouflage coat when he entered the Wishing Well, while the witnesses who identified Petitioner as having a knife at the Linda Vista Plaza an hour-and-a-half after the murder testified that Petitioner's coat was solid orange or red in color—not camouflage. (State's Lodging A-39 at 1104, 1109-10, 1132, 1136; A-40 at 1155, 1167-69, 1171-72, 1183.)

Notwithstanding the fact that trial counsel thoroughly impeached Edson, Petitioner now argues counsel should have done more. At trial, Edson testified that he had previously been convicted of Grand Theft Auto in 1983 and spent two-and-a-half years in prison. (State's Lodging A-40 at 1190.) He also testified that this auto theft was his only felony. (*Id*. at 1191.) Petitioner has now brought forward evidence that in 1986, in the State of Washington, Edson was also convicted of felony first degree theft and served four months in jail. (Dkt. 275-20 at 5-6.) Petitioner argues that the jury, faced with Edson's lie regarding his criminal history, would have disbelieved Edson's testimony about seeing Petitioner enter the Wishing Well.

The Court concludes that Petitioner has not raised a substantial claim that his trial counsel performed deficiently with respect to the investigation and cross-examination of Edson. Defense counsel focused the entire cross-examination on attacking Edson's credibility. Counsel brought out the weaknesses in Edson's testimony in a way that was

understandable to the jury, pressing many compelling points that detracted from Edson's reliability and credibility as a witness. That the jury was not ultimately convinced does not mean that trial counsel performed deficiently.

"[M]atters such as counsel's approach to impeachment are often viewed as tactical decisions, and such decisions do not constitute deficient conduct simply because there are better options." *Reynoso v. Giurbino*, 462 F.3d 1099, 1113 (9th Cir. 2006). The Constitution does not require that defense counsel ask "every possible impeachment question." *West v. Varano*, 2014 WL 7139790, at *10 (M.D. Pa. Dec. 12, 2014); *see also Strickland*, 466 U.S. at 689 ("[I]t is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable."). Because there is no merit to Petitioner's claim that trial counsel rendered deficient performance with respect to Edson, the Court need not address the issue of PCR counsel's failure to raise this claim.

b)    *Claim 3(A)(ii): Scott Bianchi*

Petitioner also claims that trial counsel failed to adequately investigate and cross-examine inmate Scott Bianchi. Bianchi testified at trial that, while he and Petitioner were incarcerated together, Petitioner confessed to killing Mrs. Vanderford. According to Bianchi, he and Petitioner were talking about inmate Howard Gilcrist, and Petitioner told Bianchi that Gilcrist was a snitch for testifying against Petitioner at the preliminary hearing. (State's Lodging A-41 at 1567-70.) Bianchi had already heard about Gilcrist's testimony, as it "was general knowledge among the inmates." (*Id.* at 1569.) Bianchi

testified that Petitioner then told him "that [Petitioner] killed the lady, that he didn't mean to kill her, and that he felt really bad for her." (*Id*.) According to Bianchi, Petitioner told him that the murder took place at a gift shop in the Linda Vista Plaza. Petitioner "got startled" while he was robbing the shop, "acted on impulse," and then "once he got started it was like he had to finish the job." (*Id*. at 1570.)

Bianchi acknowledged on the stand that he had previously been disciplined for lying to correctional officers and that Bianchi and two other inmate snitch witnesses had been taken to the courthouse together. In defense counsel's words, all three inmate witnesses "had plenty of chances to talk things over." (*Id*. at 1602.) On cross-examination, counsel also elicited testimony that Bianchi had been allowed to see his fiancée and his mother while he was in the police department with the other snitch witnesses, implying that Bianchi agreed to testify because of these benefits. Although Bianchi testified that he expected to "gain nothing" by testifying against Petitioner, defense counsel pointed out that Bianchi had a parole hearing coming up in about two years. Bianchi acknowledged that he wanted to "make a good impression" in front of the parole board, but claimed that he had not decided whether to bring up his testimony, against a defendant in a murder case, as a point in favor of release on parole.[9] (*Id*. at 1605-06.)

---

[9]     Although the inmate informants eventually received letters from the prosecutor's office praising them for their testimony at Petitioner's trial, there is no evidence that Petitioner's trial counsel knew or could have discovered during trial that the prosecutor intended to write such letters. Indeed, in postconviction proceedings, the state district court found that the prosecutor's decision to write the letters was not made until after trial. (State's Lodging A-2 at 229-30.)

Bianchi also admitted at trial that he had previously informed a police detective that if Bianchi were called to testify, he would "blow the Prosecutor's case" and provide "unbeneficial" testimony. (*Id.* at 1608-10.) Bianchi's explanation for these previous statements was that he said them because he wanted to scare the police away and to make them leave him alone, rather than because the statements were true. (*Id.*) Further, defense counsel prompted Bianchi to repeat his testimony that Petitioner told him the murder occurred at the Linda Vista Plaza—which was about a half of a mile *away* from the murder scene—thus pointing out that Petitioner's alleged confession to Bianchi was at least partially inaccurate. (*Id.* at 1613.) Finally, Bianchi acknowledged that he would do anything to try to get out of prison, "as far as my behavior is concerned," though Bianchi insisted he did not make up Petitioner's confession. (*Id.* at 1616.)

As can be seen from this summary, defense counsel investigated and cross-examined Bianchi in a reasonable manner and to a reasonable extent. Counsel shined a light upon Bianchi's motives to commit perjury and elicited testimony that did not match the facts of the murder. Like trial counsel's cross-examination of Edson, the cross-examination of Bianchi met or exceeded the requirements of the Sixth Amendment. "Under *Strickland*, counsel's representation must be only objectively reasonable, not flawless or to the highest degree of skill." *Dows v. Wood*, 211 F.3d 480, 487 (9th Cir. 2000).

Further, the later-presented evidence from other inmates contending that Bianchi lied at trial does not advance Petitioner's IATC claim because there is nothing in the

record to suggest that trial counsel rendered deficient performance by failing to discover this evidence earlier. Indeed, the state court found credible Bianchi's testimony that, while he had indeed recanted to several people (including Petitioner's attorney), it was Bianchi's *recantation*—rather than his trial testimony—that was false. (State's Lodging A-3 at 58-62.)

This credibility finding is entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1), and Petitioner has the burden of rebutting that presumption by clear and convincing evidence. In attempting to do so, Petitioner points to the relatively recent affidavits presented by Gilcrist (who testified at the preliminary hearing) and Acheson (who testified at trial).

During proceedings on Petitioner's third postconviction petition, Acheson submitted an affidavit stating that Gilcrist, Heistand, and Bianchi "told [Acheson] of how they had made up most of what they were saying, in order to get out" of prison. (State's Lodging G-105, Ex. D.) Acheson's new affidavit stated that the inmate informants received benefits from testifying against Petitioner, such as pizza, grocery bags full of cigarettes, and visits with family. (*Id.*) According to Acheson, Petitioner told him he had gotten rid of a gun in connection with the murder; Acheson stated in his affidavit that when he mentioned this to detectives, the detectives "corrected" him and told him that the murder weapon was a knife. Acheson also testified that he and the other inmate

informants "would all stay up late and talk about the trial and what . . . we were going to say when we got up on the stand."[10] (*Id.*)

Gilcrist submitted an affidavit in support of Petitioner's sixth postconviction petition. In that affidavit, Gilcrist recanted his preliminary hearing testimony. He stated that Detective Smith fed him information about the case and that Gilcrist lied when he testified that Petitioner confessed to him. (State's Lodging K-125, Ex. 1 at 1.) Gilcrist stated that he shared this information with Heistand and Bianchi. (*Id.* at 2.) According to Gilcrist's affidavit, Bianchi was reluctant to testify against Petitioner, but Gilcrist told him that "it was for me [Gilcrist], that we needed to burn Fields." (*Id.*)

The affidavits of Acheson and Gilcrist do not constitute clear and convincing evidence calling into question the state court's credibility findings that Bianchi and the other inmate snitches told the truth at trial or that Salvador Martinez lied at the hearing on Petitioner's first motion for a new trial when Martinez claimed Bianchi confessed to perjury. Gilcrist and Acheson claim that Bianchi committed perjury when he testified that Petitioner had confessed to him, but given the devastating problems with Gilcrist's and Acheson's own credibility, this Court cannot say that their statements sufficiently rebut the trial court's finding that Bianchi consistently told the truth when he was under oath— including at trial.

---

[10]     Although Acheson stated in this new affidavit that he would not have testified against Petitioner without the information he was given by police, Acheson does not actually recant his trial testimony regarding Petitioner's suspicious behavior. Indeed, he reaffirmed that Petitioner "kept freaking out concerning the 'crime-stoppers' T.V. commercials" about the Wishing Well murder. (State's Lodging G-105, Ex. D.)

Petitioner also claims that other evidence justifies this Court's dismissal of the state court's credibility findings regarding Bianchi. For example, Petitioner submitted (with his reply brief) affidavits of correctional officers and inmates, alleging that the circumstances surrounding Petitioner's confession to Bianchi made the alleged communication impossible. (Dkt. 313-2 to 313-8.) But these affidavits focus on the physical layout and setup of the dayroom, where Petitioner confessed to Bianchi, approximately 25 years ago. Alleged memories of how a particular area of the prison was set up 25 years ago simply do not constitute clear and convincing evidence that Bianchi testified falsely or that police or prosecutors fed him information so he could manufacture false confessions or otherwise present false evidence against Petitioner. *See* 28 U.S.C. § 2254(e)(1).

The Court concludes, as a matter of law, that Petitioner's IATC claim with respect to Bianchi does not meet the *Martinez* exception to procedural default because trial counsel performed adequately. Therefore, there is no need for an evidentiary hearing on this issue.

c)      *Claim 3(E): Joe "Turkey" Heistand*

Petitioner next claims that trial counsel failed to conduct an adequate investigation and cross-examination of inmate snitch Joe Heistand. At trial, Heistand testified that in May 1989, after Petitioner had been charged with murder, Petitioner confessed to Heistand that he committed the murder at the Wishing Well. (State's Lodging A-41 at 1478-80.) Heistand stated that he and Petitioner were housed about four or five cells apart

and "kitty-corner" from each other when Petitioner confessed. (*Id*. at 1469.) According to

Heistand, he could hear Petitioner through a vent that ran between their cells. (*Id*. at

1473.)

Heistand testified that Petitioner told him he entered the Wishing Well gift shop to

make a "score" and went to the cash register at the back of the room. Mrs. Vanderford

then came into the shop from the back area and started "screaming and hollering." (*Id*. at

1480.) According to Heistand, Petitioner told him that the victim "didn't cooperate and

that's when the stabbing occurred." (*Id*.) Petitioner also told Heistand that he had used an

old hickory butcher knife, about 10 inches long, to kill Mrs. Vanderford, and that

Petitioner took about $48 to $50 from the cash register. (*Id*. at 1481-82.) Heistand then

testified that Petitioner told him that Jim Oetting, Petitioner's roommate, would give

Petitioner a false alibi and that Oetting had lied in court for Petitioner before. (*Id*. at

1483-84.)

On cross-examination, trial counsel questioned Heistand regarding his continuing

failure to abide by the law and his frequent incarcerations, including for drugs, burglary,

and forgery. (*Id*. at 1494.) Heistand admitted that his story about Petitioner's confession

had changed over time. Initially, Heistand had informed the police that Petitioner

confessed to Heistand only after a police detective asked various inmates to report to

them anything Petitioner said. At trial, however, Heistand testified that Petitioner

confessed *before* the detective spoke with the inmates incarcerated with Petitioner. (*Id*. at

1495-98.)

Petitioner's counsel then elicited testimony from Heistand that Petitioner confessed to him through the pipe chase vent that ran underneath the cells. (*Id*. at 1498-99.) This vent was situated so that if Petitioner spoke into the vent, anything he would also have been heard by all of the other inmates throughout the entire tier. (*Id*. at 1499.) Counsel continued:

| | |
|---|---|
| Defense Counsel: | So you are claiming you had this conversation where all these admissions were made to this horrible offense, and it was being broadcast around the entire tier? Is that what you're telling us, Mr. Heistand? |
| Heistand: | Not really broadcast. I wouldn't say broadcast, no. I would say if people were paying attention they could have heard the conversation, yes. |
| Defense Counsel: | Well, [Petitioner] was quite a distance from you? Wasn't it a good five cells away and across the hall? Isn't that right? |
| Heistand: | Yes. |
| Defense Counsel: | You've changed your testimony on that one, haven't you, from the hearing we had here a month ago? |
| Heistand: | No, I believe I told you then that I lived in [cell] 38 and I was 38 cell here (indicating), and he was down this way (indicating), catty-corner, not straight across, not setting this way, down this way (indicating). |
| Defense Counsel: | You told us, Mr. Heistand, . . . [a]t that hearing that [Petitioner's] cell was one cell catty-corner, isn't that right? |
| Heistand: | If I said one, I didn't mean one cell. He lived in 47 or 48, I believe, was the cell. |
| Defense Counsel: | You were under oath at that hearing weren't you? |

| | |
|---|---|
| Heistand: | Yes. |
| Defense Counsel: | And you were sworn to tell the truth? |
| Heistand: | Yes. |
| Defense Counsel: | Could the witness be shown the transcript from that hearing. |
| . . . . | |
| Defense Counsel: | . . . . I'm going to read the question. I'm going to have you read your answer, okay? Let's see what you said. Question: "How close were you to [Petitioner's] cell?" And your answer? |
| Heistand: | "Close." |
| Defense Counsel: | "And were you next door or across the hall?" |
| Heistand: | "No, huh-uh. I would say across the hall." |
| Defense Counsel: | Question: "Okay. Were you directly across the hall?" Answer? |
| Heistand: | "No, catty-corner." |
| Defense Counsel: | "Yes, one cell catty-corner?" Your answer? |
| Heistand: | "I believe so, yes." |
| Defense Counsel: | And now you're telling us you were actually five cells away? |
| Heistand: | If that's what it is, yes. |

(State's Lodging A-41 at 1499-1500.)

Heistand testified that each cell was about 8 feet by 10 feet in size, so that four cells down would be about 32 feet away, and five cells would be 40 feet away. (*Id.* at 1504.) Heistand acknowledged that because Petitioner was down the row and across the

**MEMORANDUM DECISION AND ORDER - 39**

hall, he was approximately 46 feet away at the time Petitioner confessed to the murder—through the pipe chase vent—and that Petitioner spoke very loudly through that vent. (*Id.* at 1505.) Defense counsel then asked Heistand, "And so [Petitioner] made all these statements, all these admissions and this confession to you speaking at this level in a tier unit occupied, cells occupied by other inmates. Is this your testimony?" Heistand answered, "Yes." (*Id.*)

Petitioner's attorney also pushed Heistand about details of Petitioner's alleged statements, pointing out repeatedly that Petitioner's supposed confession to Heistand included information that the cash register was at the back of the gift shop when, in actuality, it was in the front. (*Id.* at 1519.)

Petitioner first claims that trial counsel should have asked Heistand more questions about "the evolution" of his story, specifically that Heistand's previous statements began with Heistand being housed "right next to" Petitioner, then "across the hall" and "catty-corner." (Dkt. 275-1 at 51.) But as the above transcript shows, counsel lambasted Heistand with the improbability of his story. That Petitioner currently thinks the cross-examination should have been even more robust does not mean that trial counsel performed below an objective standard of reasonableness.

Petitioner next claims that talking through the vent "was only possible in adjacent cells that shared a pipe chase vent on the same side of the hall or aisle," and that Petitioner therefore could not have confessed to Heistand in the way Heistand described. (Dkt. 275-1 at 52.) However, Petitioner's counsel asked a series of devastating questions

regarding the layout of the cells and the vent, getting Heistand to admit that for his testimony to be true, Petitioner would have had to speak very loudly, through a vent, from 46 feet away, and that the conversation would have been audible to every other inmate on the tier. That trial counsel did not ask one or two more questions about the vent does not support a substantial *Strickland* claim.

Petitioner's other claims regarding the cross-examination of Heistand—involving a misstatement about the amount of money Heistand had stolen from the Aryan Nations and a newspaper article about the murder that Heistand stated he had read—are similarly meritless. Defense counsel met or exceeded constitutional requirements by thoroughly impeaching Heistand. Further investigation of Heistand's story, or a few additional questions that counsel could have asked Heistand, do not add any merit to Petitioner's *Strickland* claim. For these reasons, Petitioner is not entitled to a *Martinez* hearing on his claim regarding Heistand.

d) *Claim 3(F): Jeff Acheson*

Petitioner also raises an IATC claim regarding the investigation and cross-examination of inmate Jeff Acheson. Acheson testified at trial that he and Petitioner were "bunk mates" at the Ada County Jail when Petitioner was charged in the Shopko matter, and that Acheson often played cards with Petitioner and two other inmates, Stan Nelson and Billy Lear. (State's Lodging A-41 at 1423, 1427.)

Acheson testified that near the end of March 1988, while they were playing cards, if a Crime Stoppers television report about the murder aired in the room where they were

playing, Petitioner would "sometimes go up and either change the channel, turn the TV off, or turn the volume down." (*Id*. at 1430.) According to Acheson, Petitioner acted "[v]ery full of anxiety, pretty angry sometimes" when these reports would air. After Petitioner calmed down, "he'd sit down at the table and make a different statement, saying that 'They can't pin that on me,' or 'They're trying to pin that on me but I took care of that.'" (*Id*. at 1430-31.) Acheson testified that Petitioner told him the police would not be able to link Petitioner to the Wishing Well murder because Petitioner "had taken care of the evidence." (*Id*. at 1431.)

At this point Petitioner's counsel objected, and the court held a sidebar. Defense counsel pointed out that Acheson had previously stated that Petitioner had disposed of the gun he used in the Shopko matter. Counsel objected to any such testimony, and the prosecutor clarified that he would not be eliciting testimony from Acheson regarding anything Petitioner had said about the Shopko incident. (*Id*. at 1432-33.) In open court, the prosecutor asked Acheson to clarify the subject matter of Petitioner's statements; Acheson responded that Petitioner's incriminating statements and his behavior regarding the Crime Stoppers reports involved the Wishing Well murder. (*Id*. at 1434.)

Acheson acknowledged that he waited over two years before informing the authorities of Petitioner's statements. He testified on direct examination that he did not come forward because he "thought [Petitioner] was already in custody and serving time on that charge." (*Id*. at 1436.) On cross-examination, Petitioner's counsel pressed Acheson regarding that two-year delay. Defense counsel got Acheson to change his

reason for not coming forward. Instead of believing that Petitioner was already serving time for the murder as he testified on direct, Acheson stated on cross that he did not initially come forward because, two years earlier, he "thought [the authorities] had all the evidence they needed" about the murder. (*Id*. at 1455.)

Trial counsel also succeeded in establishing a motive for Acheson to fabricate his testimony—to curry favor with the authorities while on his third term of probation so he could avoid going to prison for at least three, and up to ten, years. Defense counsel began by asking Acheson about his convictions for theft and his probation violations. Acheson acknowledged that he was currently on his third term of probation and that, if he did not successfully complete that probation, he would be "a three-time loser" and would be facing three to ten years in prison. (*Id*. at 1442-43.) Counsel emphasized with Acheson that two years previously, when Petitioner allegedly made the incriminating statements to Acheson, Acheson was not trying to successfully complete his rider (probation and retained jurisdiction) like he was at the time of trial. Counsel stated, "Mr. Acheson, if you play this rider correctly, you, a three time loser, can be out of prison in 120 days and on probation and avoid a three to ten year prison sentence, isn't that right?" Acheson answered, "Yes, it is, correct." (*Id*. at 1456.)

Petitioner now argues that counsel should have done more to create doubt about Acheson's testimony. Specifically, Petitioner believes counsel should have investigated other inmates who played cards with Acheson and Petitioner. According to Petitioner, these witnesses—Stan Nelson and Billy Lear—"could have testified that [Petitioner] was

not nervous, and that he never confessed to committing the Wishing Well murder or getting rid of any evidence." (Dkt. 275-1 at 52.)

With his reply brief, Petitioner submitted an affidavit from Stan Nelson stating that he remembers Petitioner talking about getting rid of a gun, "but Nelson's memory is that [Petitioner] was discussing his pending charges [on the Shopko incident, not the murder]." (Dkt. 313 at 28; *see also* Nelson Aff., Dkt. 313-11, at ¶ 15.) Nelson also claims that Petitioner "never told anybody, in my presence, that he had anything to do with a murder" and that Petitioner never got up to change the channel or the volume on the TV. According to Nelson, other inmates would not have allowed him to disrupt the television broadcast. (Nelson Aff. at ¶¶ 12, 14.)

The Court concludes as a matter of law that Nelson's affidavit, based on a 25-year old memory, is insufficient to establish a substantial IATC claim with respect to trial counsel's impeachment of Acheson. Nelson does not aver that he was constantly listening to Petitioner's conversations with Acheson or that he constantly paid attention to every action that Petitioner took. Nelson's affidavit regarding Petitioner's lack of a confession in his presence could diminish Acheson's credibility only if Nelson was *always* present and attentive while Petitioner and Acheson had their conversations. Similarly, Nelson's quarter-of-a-century old intuition of how other inmates would have reacted to Petitioner's turning down the volume or changing the channel adds no merit to Petitioner's IATC claim involving Acheson. When weighed against the substantial impeachment that trial counsel already achieved, Nelson's 2014 affidavit does not support a substantial claim

that Petitioner was prejudiced by trial counsel's failure to investigate and interview Nelson, even assuming that trial counsel should have done so.[11]

The affidavit certainly does not call into question the testimony of the other inmates, particularly that of Scott Bianchi, who—as explained previously—was found credible by the state trial court after the court saw and heard Bianchi testify at multiple evidentiary hearings. The jury did not have to believe all of the inmate snitch witnesses in order to convict Petitioner, and given that this Court is bound by the state court's finding that Bianchi's trial testimony was true, additional potential impeachment of a different inmate witness does not support a reasonable inference that, had Acheson been further impeached, there is a reasonable probability that Petitioner would not have been found guilty.

For the foregoing reasons, Petitioner is not entitled to a *Martinez* hearing on his IATC claim involving Acheson.

e) *Conclusion re: Edson and the Inmate Snitch Witnesses*

The case against Petitioner was based almost entirely upon the credibility of the respective eyewitnesses and inmate informants. Trial counsel impeached Edson, as well as the inmate snitches, extensively and skillfully; yet the jury still voted to convict. The members of the jury reasonably could have credited Edson's testimony notwithstanding

---

[11]     During postconviction proceedings, trial counsel testified that the decision not to investigate the hundreds of inmates who had contact with the snitch witnesses "was not an efficient use of our resources, our time, and our investigative resources." (State's Lodging A-43 at 2000.) Thus, though counsel was unaware of the existence of Stan Nelson and Billy Lear until trial (*id.* at 1965), counsel had already recognized the possibility of investigating similar inmates, but decided to forego that avenue of investigation. It appears that this decision was based on a reasonable investigative strategy. *Strickland*, 466 U.S. at 690-91.

the holes in his story, as they could have credited the testimony of at least one of the inmate snitch witnesses despite the serious credibility problems presented by each of those witnesses. That a later court might not be persuaded by Edson's and the inmates' testimony from a cold transcript does not call into question trial counsel's otherwise reasonable investigation and cross-examination. Trial counsel adequately exposed the weaknesses in all of these witnesses' testimony and gave the jurors much to consider while they decided who was telling the truth. The Constitution requires no more.

The Court has determined that trial counsel's acts or omissions regarding Edson and the inmate snitches do not, alone or in combination, present a substantial IATC claim. Because Petitioner's IATC claims involving the impeachment of Edson, Bianchi, Heistand, and Acheson are not substantial (the "prejudice" prong of the *Martinez* cause-and-prejudice inquiry), the Court need not address Petitioner's claim that initial PCR counsel, who had previously represented the inmate snitch witnesses, operated under a conflict of interest and rendered ineffective assistance in failing to raise these IATC claims in initial postconviction proceedings (the "cause" prong of the *Martinez* cause-and-prejudice inquiry). (*See* Dkt. 275-1 at 48-49; Dkt. 313 at 58-59.)

      ii.      <u>Claims That Trial Counsel Failed To Investigate Other Inmates and Gather Documents To Gain Information That Could Rebut the Trial Testimony of Bianchi, Heistand, and Acheson</u>

The second group of claims that Petitioner argues is subject to a *Martinez* analysis consists of Claims 3(L) and 3(N) of the Second Amended Petition. Claim 3(L) asserts that trial counsel rendered ineffective assistance by failing to investigate the inmates who

were in contact with Acheson, Bianchi, and Heistand before those informants testified at trial. Claim 3(N) alleges that trial counsel should also have obtained copies of all police and IDOC documents to gain information that could rebut the testimony of the inmate informants. Petitioner asserts that these claims are substantial because that information could have been used to rebut the informants' testimony and aid "in the presentation of the case and cross examination of witnesses." (Dkt. 275-1 at 57.)

As an initial matter, the Court notes that *Martinez* does not apply to Claim 3(L)— that Petitioner was denied effective assistance of counsel based on counsel's failure to investigate inmates who had contact with the testifying informants. Petitioner raised this claim in his initial postconviction petition (State's Lodging A-2 at 201-02, 218-19), but did not raise it *on appeal* from the state district court's dismissal of that petition (State's Lodging B-48). Because the narrow exception created in *Martinez* does not apply to alleged ineffectiveness of PCR counsel in "appeals from initial-review collateral proceedings," it cannot be used to excuse the default of Petitioner's claim involving inmates who were in contact with the testifying informants.[12] *Martinez*, 132 S. Ct. at 1320. Thus, Petitioner cannot meet the third prong of the *Martinez* test, and the Court

---

[12] This failure on the third prong of *Martinez* as to Claim 3(L) also provides an alternative basis for rejecting Petitioner's *Martinez* argument with respect to Claim 3(F)—trial counsel's investigation of inmates who played cards with Acheson, and the newly-procured affidavit of Stan Nelson.

need not determine whether Claim 3(L) is substantial[13] or whether PCR counsel was ineffective in failing to raise it in the initial postconviction petition.

With respect to Claim 3(N), Petitioner states only that trial counsel (1) "did not obtain all reports and notes of all contacts by police and their investigators with inmates Bianchi, Heistand, Gilcrist, and Acheson, together with documents and notes prepared by the inmates as well as any and all statements by those inmates, including statements obtained by the prosecution," and (2) failed to investigate and obtain police documents such as "contemporaneous law enforcement notes of the evolving investigation; daily or supplemental reports from contacts with inmates, witnesses in the community and family members of the victim; and police leads to potential suspects." (Dkt. 275-1 at 57-58.) Although Petitioner states—in a conclusory fashion—that these alleged failures were prejudicial, he does not explain how that is so. Indeed, Petitioner offers no support for his claim of *Strickland* prejudice at all with respect to Claim 3(N). Petitioner states:

> In addition, numerous prison documents, showing the
> structure of B Tier and its day room, as well as the location of
> inmates, policies and procedures, should have been obtained,
> as well as housing and transport records relating to the inmate
> informants. Numerous police records likewise should have
> been obtained to detail the scope and limitations of the

---

[13] Though the Court need not reach the substantiality prong of *Martinez* with respect to Claim 3(L), there appears to be no merit to Petitioner's claim that the decision to forego investigating the hundreds of inmates who could have had contact with the multiple inmate snitches was objectively unreasonable. *See* n.11, *supra*; *see also Strickland*, 466 U.S. at 689 ("[The] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.") (internal quotation marks omitted). Trial counsel appears to have reasonably determined how to marshal the limited time and resources available in providing Petitioner a defense.

> investigation. Fields will seek to discover these records in a
> separate motion for discovery and present them at an
> evidentiary hearing.

(Dkt. 313 at 57.)

But it is Petitioner's burden at *this* stage of the proceedings to support his claim that his procedurally defaulted IAC claims are substantial and that PCR counsel was ineffective in failing to raise them. This requires a showing that Petitioner's claim of prejudice from counsel's performance is, at the very least, colorable. *See Clabourne*, 745 F.3d at 377. Petitioner has simply not attempted to do so. Therefore, Petitioner is not entitled to an evidentiary hearing on this issue, and *Martinez* does not excuse the procedural default of Claim 3(N).

### iii. Claims That Trial Counsel Failed To Raise Police and Prosecutorial Misconduct Claims under *Brady, Giglio*, and *Napue*

Petitioner next asserts that trial counsel was ineffective for failing to move for a new trial based on the state's alleged violations of *Brady v. Maryland*, *Giglio v. United States*, and *Napue v. Illinois*. (Dkt. 275-1 at 45.) These issues are represented in Claim 3(O) of the Second Amended Petition. (Dkt. 271 at 37.)

#### a) *Standards of Law*

The following standards of law are those applicable to the merits of *Brady, Giglio*, and *Napue* claims, and those standards must be considered when determining whether trial counsel acted ineffectively in failing to raise such claims. The prosecution has a duty under the Due Process Clause of the Fourteenth Amendment to disclose exculpatory evidence to the defense that is material to guilt or punishment. *Brady v. Maryland*, 373

U.S. 83, 87 (1963); *United States v. Bagley*, 473 U.S. 667, 676 (1985). In *Giglio v. United States*, the Supreme Court held that the prosecutor must also disclose impeachment evidence. 405 U.S. 150, 153-55 (1972). A meritorious *Brady* claim contains three essential components: (1) the evidence must be favorable to the accused, because it is either exculpatory or impeaching; (2) the prosecution must have withheld the evidence, either intentionally or inadvertently; and (3) the evidence must be material to guilt or punishment. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

Suppressed evidence is material under *Brady* and *Giglio*, and its non-disclosure is prejudicial, when there is a reasonable probability that had the evidence been disclosed, the result of the proceeding would have been different. *Bagley*, 473 U.S. at 682; *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995). In determining materiality, the court must assess the weight and force of the withheld evidence collectively, rather than item by item. *Kyles*, 514 U.S. at 433-34.

In *Napue v. Illinois*, the United States Supreme Court held that the prosecution (1) cannot present evidence it knows is false and (2) must correct any falsity of which it is aware, even if the false evidence bears on the credibility of a witness instead of bearing directly on the defendant's guilt or innocence. 360 U.S. 264, 269 (1959). A petitioner meets the *Napue* test if he shows that (1) the prosecution knowingly presented (or failed to correct) false evidence or testimony at trial, and (2) the testimony or other evidence was material, meaning there is a reasonable likelihood that the false testimony or other

evidence could have affected the judgment of the jury. *See Hayes v. Brown*, 399 F.3d

972, 984 (9th Cir. 2005) (en banc).

b)     *Substantiality Analysis*

In arguing that counsel should have raised *Brady*, *Giglio*, and *Napue* claims,

Petitioner first relies on Salvador Martinez's testimony, at the evidentiary hearing on

Petitioner's first motion for a new trial, that Martinez had been informed by the inmate

witnesses that the police had provided them with information about the case to support

their testimony. However, as explained above, the state court found that Martinez's

testimony was not credible. Specifically, the court noted that Martinez's testimony

regarding threats he allegedly received was directly contrary to testimony Martinez had

given earlier in a different case. (States' Lodging A-2 at 146-47.) The court also found

that law enforcement had taken great care to keep all of the inmate informants away from

general population inmates such as Martinez. (*Id.*) These findings are presumed correct.

28 U.S.C. § 2254(e)(1).

Petitioner also relies on the testimony of inmates Amerson and Marquess, at

Petitioner's evidentiary hearing on his second motion for a new trial, that Bianchi

admitted lying about Petitioner's confession, that he had been promised benefits for

testifying, and that he had been shown the case file by Detective Smith. However, the

state district judge, who saw the witnesses' demeanor and listened to their testimony first-

hand, believed Bianchi, who—despite his out-of-court recantations—testified that

nobody told him what to say, fed him any information, or promised him anything in

exchange for his testimony. *See Penasquitos Village, Inc. v. N.L.R.B.*, 565 F.2d 1074, 1078-79 (9th Cir. 1977) ("All aspects of [a] witness's demeanor including the expression of his countenance, how he sits or stands, whether he is inordinately nervous, his coloration during critical examination, the modulation or pace of his speech and other non-verbal communication may convince the observing trial judge that the witness is testifying truthfully or falsely. These same very important factors, however, are entirely unavailable to a reader of the transcript . . . ."). Petitioner has not shown by clear and convincing evidence that this Court should disregard the state court's credibility findings. *See* 28 U.S.C. § 2254(e)(1).

The affidavits of Acheson and Gilcrist do not aid Petitioner's cause either. Acheson and Gilcrist claimed—years after the trial—that they received benefits in exchange for testifying and had been fed case information by the police, that Gilcrist lied at the preliminary hearing, and that the inmate snitch witnesses colluded on how they would testify falsely.

But Gilcrist and Acheson both told wildly different stories over 20 years ago. The Court sees no reason why these later statements by Gilcrist and Acheson are any more credible than their respective testimony at the preliminary hearing, at trial, or during postconviction evidentiary proceedings. Moreover, Petitioner does not explain *how* trial counsel could have discovered before, during, or soon after the trial that Gilcrist and Acheson would provide testimony stating that police or prosecutors fed information to the inmates, withheld evidence from the defense, or knowingly failed to correct false

testimony. Indeed, at that point in time Gilcrist had recently testified for the prosecution at Petitioner's preliminary hearing, just as Acheson did during trial. Acheson signed his most recent affidavit in 2004, and Gilcrist did not decide to recant his preliminary hearing testimony until after a medical crisis in 2009—much too late for trial counsel, or postconviction counsel for that matter, to have obtained that evidence in the late 1980s or the early 1990s. (State's Lodging G-105, Ex. D; K-126 at 264.)

There is simply no merit to Petitioner's claim that trial counsel performed deficiently in failing to raise, under *Brady*, *Giglio*, and *Napue*, claims of "knowing use of perjured evidence, police misconduct, suppression of exculpatory evidence, and a failure to correct false testimony." (Dkt. 275-1 at 53) Petitioner's underlying IAC claims regarding these issues are insubstantial, and PCR counsel was therefore not ineffective in failing to raise those IAC claims in Petitioner's initial postconviction proceedings. Thus, the procedural default of these claims is, as a matter of law, not excused under *Martinez*.

Finally, Petitioner argues that even if trial counsel was not ineffective for failing to discover and raise police and prosecutorial misconduct claims, traditional cause and prejudice exist to excuse the default of Petitioner's independent and substantive claims of police and prosecutorial misconduct. (Dkt. 313 at 59-60.) However, Petitioner's only argument with respect to non-*Martinez* cause and prejudice is that "[a]ssuming [Petitioner] can prove the materiality" of those claims, he will also establish prejudice from the failure to raise those claims. (*Id*. at 59.) This is insufficient to support a claim

that Petitioner suffered "actual and substantial" prejudice as required by *Frady*, 456 U.S. at 170.

<blockquote>
iv.    Claims That Trial Counsel Was Ineffective in Failing to Call Jim Oetting to Testify after Promising the Jury an Alibi Witness
</blockquote>

The next set of IATC claims that Petitioner claims are subject to the *Martinez* exception consists of Claims 3(C) and 3(D) of the Second Amended Petition. Those claims allege that trial counsel rendered ineffective assistance by (1) telling the jury in opening statement that the defense would call an alibi witness and (2) failing to call that witness.

Jim Oetting, Petitioner's roommate, initially told police that Petitioner was home with him at the time of the murder, watching a television news report about the murder. Later, however, Oetting stated to the police that it might have been a different day. Oetting then reviewed the news report that trial counsel had subpoenaed from the television station and specifically remembered the broadcast, which made Oetting certain that he and Petitioner had watched it together. During opening statement, Petitioner's counsel told the jury Oetting would testify that Petitioner was at home with him at the time of the murder and that they both watched the noon broadcast of a news report of the crime. (State's Lodging A-33 at 871.)

Trial counsel testified during postconviction proceedings that Oetting's potential testimony about Petitioner's alibi was based on the news report Oetting remembered watching—Oetting saw a video of the broadcast and confirmed that he had seen that particular broadcast with Petitioner. (State's Lodging A-43 at 1968-69.) However, during

trial the television station informed defense counsel that the video Oetting had reviewed was not, in fact, the broadcast shown at noon on the day of the murder. Rather, it was a different broadcast and could have been in the evening on the day of the murder or on an entirely different day. (*Id*. at 1969.) The television station no longer had the initial broadcast that aired at noon on the day of the murder and that Oetting used to confirm his recollection that he was with Petitioner at that time.

Faced with this new information, trial counsel decided not to call Oetting as an alibi witness. Oetting had previously admitted committing perjury in Petitioner's trial on the Shopko assault. When counsel initially thought Oetting had reviewed the correct video, he was willing to risk Oetting's prior perjury coming up during his testimony. After learning that Oetting could no longer confirm his recollection based on viewing the broadcast, however, counsel decided otherwise. (*Id*. at 2002-04.) Trial counsel recognized that not putting Oetting on the stand after having told the jury about an alibi was a difficult decision, but it was one that he made after serious consideration and discussion with co-counsel and with Petitioner. (*Id*. at 2004.)

Although some might consider it best practice for an attorney to avoid promising a jury that any particular witness will testify, Petitioner's claim that trial counsel's actions in this matter were anything other than rational tactical decisions is insubstantial. Formulating an alibi defense and preparing the jury for alibi testimony was a reasonable strategy. Trial counsel's promise in opening statement ended up being unfulfilled, "but that shows only that the defense strategy did not work out as well as hoped." *Richter*, 562

U.S. 86, 89 (2011). Deciding to call Oetting as an alibi witness was reasonable, but so was deciding not to do so once the television station revealed to counsel that the video Oetting viewed was not the noon broadcast and Oetting's "recollection of what supported his alibi[] broke down." (*Id.*)

Because circumstances can quickly and drastically change in the middle of trial, the Court is not persuaded that it was deficient performance for counsel to fail to produce the promised witness. This is particularly so because here, the reasons for breaking the promise were not apparent at the time counsel gave the opening statement. *See United States ex rel. Hampton v. Leibach*, 347 F.3d 219, 258 (7th Cir. 2003) (finding counsel's performance deficient when counsel broke a promise to the jury that the defendant would testify, where the "potential disadvantages of [the defendant's] testimony were ones that would have been obvious from the outset of the case"). Petitioner's trial counsel could not have anticipated that the news station would turn over the wrong broadcast in response to the subpoena, and counsel's reaction to this unfavorable situation was not objectively unreasonable given the serious problems with Oetting's credibility.

Further, any claim that Petitioner was prejudiced by trial counsel's promise and later failure to call Oetting is also insubstantial, and PCR counsel's failure to raise Claims 3(C) and 3(D) was not unreasonable. Oetting had previously committed perjury when he testified on Petitioner's behalf in the Shopko trial. Thus, even if Oetting had testified, he would have been excoriated on cross-examination, particularly once Oetting could no longer point to the news broadcast as support for his alibi testimony. There is no merit to

Petitioner's claim that Oetting's alibi testimony would have given rise to a reasonable probability of a different result.

    v.  <u>Claims That Sentencing Counsel Failed to Adequately Represent Petitioner or To Investigate and Prepare Mitigation Evidence</u>

  In Claims 3(I), 3(J), and 3(K), Petitioner alleges that counsel did not competently represent Petitioner at sentencing and failed to adequately prepare and investigate mitigation evidence to present at the sentencing proceeding. However, Petitioner's entire argument with respect to cause and prejudice as to his sentencing IAC claims consists of the following:

> Trial counsel failed to investigate and prepare a thorough life history of Fields, detailing his difficult life, history of abuse, institutionalization at a young age, and mental problems. Had trial counsel investigated Fields's background and history, and met with him to explain the evidence that was available and how it might help him, Fields would have allowed the use of much of that evidence during the penalty phase. Trial counsel's failure to work with Fields on the presentation of a mitigation case led to an ineffective sentencing presentation.

(Dkt. 275-1 at 59-60 (citations omitted).)

  This brief, vague, and generalized argument does not remotely suggest that Petitioner is entitled to an evidentiary hearing to establish cause and prejudice under *Martinez* with respect to a sentencing IAC claim. Petitioner has not made a colorable argument, supported by specific evidence, that any *particular* defaulted sentencing IAC claim is substantial or that initial PCR counsel was ineffective in failing to raise it in state court. The Court notes that Petitioner has asserted several non-defaulted sentencing claims (*see* Dkt. 109, 127), and the Court will address on the merits any sentencing claim

that was implicitly considered by the Idaho Supreme Court, under Idaho Code § 19-2827 and *Beam v. Paskett*, 3 F.3d 1301 (9th Cir. 1993), *overruled on other grounds by Lambright v. Stewart*, 191 F.3d 1181 (9th Cir. 1999) (en banc).

## CONCLUSION

After careful consideration, the Court has determined that Petitioner cannot, as a matter of law, satisfy the *Martinez v. Ryan* standard for cause and prejudice with respect to the eleven IAC sub-claims discussed in his Motion. Additionally, the Court will defer consideration of Petitioner's request for a *Schlup* hearing to excuse procedural default until after resolution of the merits of Petitioner's non-defaulted claims.

Therefore, Petitioner's Motion for Evidentiary Hearing to Excuse Procedural Default will be denied.

## ORDER

**IT IS ORDERED:**

1.  Petitioner's Motion for Leave to File an Overlength Reply Brief (Dkt. 312) is GRANTED.

2.  Petitioner's Motion to Seal (Dkt. 315) is GRANTED. Appendix 17 to Petitioner's Reply in Support of Motion for Evidentiary Hearing (Dkt. 314) shall remain SEALED.

3.  Petitioner's Motion for Evidentiary Hearing to Excuse Procedural Default (Dkt. 275) is DENIED. It is denied *with* prejudice as to Petitioner's argument based on *Martinez v. Ryan*, 132 S. Ct. 1309 (2012). It is denied

*without* prejudice as to Petitioner's argument based on *Schlup v. Delo*, 513 U.S. 298 (1995). If necessary at a later date, the Court will allow Petitioner to renew his motion for an evidentiary hearing on his *Schlup* gateway claim, and the Court may request further briefing at that time.

4.    The parties have already filed merits briefs in this case. However, to maintain clarity in the record, the Court will order the parties to file amended merits briefs. The parties shall set forth in their amended briefs all of their arguments as to the merits of Petitioner's non-defaulted claims, rather than merely incorporating by reference their previous merits briefing. Because the Court in this next stage of the proceedings will be considering claims that were adjudicated on the merits in state court, review is limited to the record that was before the state courts, and no discovery or evidentiary hearings are permitted with respect to these claims. *See Pinholster*, 131 S. Ct. at 1398.

5.    Petitioner shall file an amended brief on the merits of his non-defaulted claims **within 90 days** after entry of this Order. Petitioner's merits brief shall not exceed **100 pages** in length.

6.    **Within 90 days** after service of Petitioner's amended merits brief, Respondent shall file an amended answering brief on the merits. The answering brief shall not exceed **100 pages** in length. Respondent need not address on the merits any claim that this Court has already determined to be

procedurally defaulted, but shall simply note the default as to any such claim and provide a citation to the Court's decision concluding that the claim is defaulted. With respect to the new claims and sub-claims raised for the first time in Petitioner's Second Amended Petition, Respondent may choose to argue that those claims are subject to summary dismissal, instead of—or in addition to—addressing the merits of the claims. Respondent need not file a separate motion for summary dismissal of such claims. If Respondent argues only for summary dismissal of these new claims and the Court later determines that such claims will not be summarily dismissed, the Court will grant the parties an additional opportunity to address the merits of those claims.

7. **Within 30 days** after service of Respondent's amended answering brief, Petitioner shall file an amended reply brief on the merits. The reply brief shall not exceed **50 pages** in length.

8. **Any brief filed by either party throughout the remainder of this litigation must contain separate sections for each habeas claim discussed, and each section heading shall specify which particular claim is addressed in that particular section of the brief.**

SO ORDERED.

DATED: March 31, 2015

Edward J. Lodge
United States District Judge